## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>INSILCO TECHNOLOGIES, INC., *et al.*,<br><br>Debtors. | : Chapter 11<br>:<br>: Case No. 02-13672 (KJC)<br>:<br>: (Jointly Administered)<br>:<br>: |
| CHAD J. SHANDLER, CREDITOR TRUSTEE OF INSILCO TECHNOLOGIES, INC., *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>DLJ MERCHANT BANKING, INC. n/k/a CREDIT SUISSE FIRST BOSTON, DLJ MERCHANT BANKING PARTNERS, L.P., DONALDSON, LUFKIN & JENRETTE SECURITIES CORP., DONALDSON, LUFKIN & JENRETTE, INC., DLJ CAPITAL FUNDING, INC., MBP II PLAN INVESTORS, L.P., DLJ OFFSHORE PARTNERS II, C.V., DLJ MILLENNIUM PARTERS-A, L.P., DLJ MILLENNIUM PARTNERS, L.P., DLJ ESC II, L.P., DLJ EAB PARTNERS, L.P., DLJ MERCHANT BANKING PARTNERS II-A, L.P., DLJ MERCHANT BANKING PARTNERS II, L.P., DLJ DIVERSIFIED PARTNERS, L.P., DLJ DIVERSIFIED PARTNERS-A, L.P., WILLIAM F. DAWSON, JR., THOMPSON DEAN, JOHN F. FORT, III, GEORGE A. PEINADO, KEITH PALUMBO, RANDALL CURRAN, DAVID HOWE, JAMES ASHTON, and MCDONALD INVESTMENTS, INC.,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:   Adv. Pro. No.<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## **COMPLAINT**

Plaintiff Chad J. Shandler, Creditor Trustee (the "Trustee") of Insilco Technologies, Inc.

*et al.*[1] ("Insilco"), by his counsel, Arent Fox PLLC and Duane Morris LLP, for his Complaint

alleges on knowledge as to the Trustee and on information and belief as to all other matters as

follows:

## Preliminary Statement

1.      This is an action by which the Trustee seeks to redress, among other things, the

grievous and massive harm a group of insiders, including Defendants DLJ Merchant Banking,

Inc. n/k/a Credit Suisse First Boston ("DLJMB"), DLJ Merchant Banking Partners, L.P.

("DLJMB, L.P."), Donaldson, Lufkin & Jenrette Securities Corp. ("DLJ Securities"), Donaldson,

Lufkin & Jenrette, Inc. ("Donaldson, Lufkin & Jenrette, Inc."), DLJ Capital Funding, Inc. ("DLJ

Capital"), MBP II Plan Investors, L.P. ("MBP II"), DLJ Offshore Partners II, C.V. ("DLJ

Offshore"), DLJ Millennium Partners-A, L.P. ("DLJ Millennium Partners-A"), DLJ Millennium

Partners, L.P. ("DLJ Millennium Partners"), DLJ ESC II, L.P. ("DLJ ESC"), DLJ EAB Partners,

L.P. ("DLJ EAB"), DLJ Merchant Banking Partners II-A, L.P. ("DLJMB II-A"), DLJ Merchant

Banking Partners II, L.P. ("DLJMB II"), DLJ Diversified Partners, L.P. ("DLJ Diversified

Partners"), and DLJ Diversified Partners-A, L.P. ("DLJ Diversified Partners-A") (collectively,

"DLJ"), inflicted upon Insilco and its creditors by wrongfully exercising their control over the

company and taking unfair and harmful actions to advance their own interests, while

compromising, prejudicing and adversely affecting Insilco's and its creditors' interests.

2.      DLJMB acquired a majority share in Insilco in 1998, and thereafter expanded its

control over the company by installing DLJ insiders as members of the Board of Directors and

---

[1]     The other debtors in these jointly administered Chapter 11 proceedings are Insilco Holding Co., InNet
        Technologies, Inc., Insilco International Holdings, Inc., Precision Cable Mfg. Corporation, Eyelets for
        Industry, Inc., EFI Metal Forming, Inc., Stewart Stamping Corporation, Stewart Connector Systems, Inc.,
        Signal Caribe, Inc. and Signal Transformer Co., Inc.

requiring the installation of DLJ affiliates in a host of fee-generating positions.  As authorized by the DLJ-dominated Board, DLJ-related entities served as Insilco's financial advisor, banker, lender, lead arranger and syndication agent.

3.      Once it had established complete dominance and control over the affairs of Insilco, DLJMB caused the company to pursue a strategy designed to maximize the value of the DLJ portfolio without regard or concern for the impact on the value of Insilco.  This so-called "value creation strategy" was a DLJ portfolio strategy, rather than an Insilco strategy.  Its key component was the sale to DLJ of a valuable and substantial Insilco asset – the Automotive Business – at an artificially low price.  To mask the transaction's substantial benefit to DLJ and harm to Insilco, DLJMB caused Insilco's Board of Directors to appoint a special committee to negotiate and approve the transaction.  The sole member of the special committee, though purportedly disinterested, was a DLJ insider who, after receiving a fairness opinion based on incomplete financial data, rubber-stamped the transaction.

4.      Throughout its relationship with Insilco, DLJMB abused its insider status. DLJMB, working through DLJMB itself and certain DLJ affiliates specified below, caused Insilco to pay enormous fees to DLJ and take action to benefit DLJ at the expense of Insilco and its creditors.

5.      DLJMB caused Insilco to deliver Insilco's assets in the Automotive Businesses to a DLJ insider.  This transaction stripped Insilco of steady cash flow and placed Insilco's creditors at risk.

6.      In June of 2001, when Insilco failed to comply with certain covenants under the Credit Agreement, DLJMB caused Insilco to cooperate with an investment advisor, Bain & Company, hired by DLJMB to advise DLJMB on its equity investment in Insilco.

7.      In late 2001, when DLJMB determined that it no longer wished to use Insilco to pursue its portfolio strategy, DLJMB sought to extract money from the company in the form of fees.  On or about January 29, 2002, DLJMB billed Insilco for fees incurred by Bain & Company on DLJMB's behalf.  DLJMB's conduct deepened the insolvency of Insilco and caused enormous damages to Insilco and Insilco's creditors.

8.      DLJ's wrongful acts were made possible by the Insilco Board of Directors' failure to fulfill their duties of care, loyalty, honesty and disclosure to Insilco.  William F. Dawson, Jr., Thompson Dean, John F. Fort, III, George A. Peinado, Keith Palumbo, Randall Curran, James Ashton, and David Howe (collectively, the "Insilco Directors"), all duly appointed members of the Insilco Board of Directors, woefully failed to fulfill their fiduciary duties and allowed DLJ's actions to cause debilitating financial harm to Insilco by approving transactions and fee payments for services intended to benefit DLJ rather than Insilco.

9.      At all relevant times, the Insilco Directors owed the strictest fiduciary duties to Insilco's creditors, including the duties of care, loyalty, honesty and disclosure.  They were required to act in the best interests of the Insilco and its creditors, and not for their own personal benefit or for the benefit of DLJ when to do so would violate their duties to Insilco and its creditors.

10.     The failure of the Insilco Directors to protect the interests of Insilco and Insilco's creditors stemmed from serious breaches of fiduciary duties and caused enormous harm to Insilco and its creditors.  The Trustee seeks damages from the Insilco Directors resulting from this conduct.  In addition, the Trustee seeks redress from DLJMB for aiding and abetting the breaches of fiduciary duties by the Insilco Directors.

11.      The harm to Insilco was aggravated by the failure of McDonald Investments, Inc.,

("McDonald") to meet the required standard of care in rendering certain fairness opinions to

Insilco.  McDonald failed to account for significant financial data and produced certain fairness

opinions that caused Insilco to rely on incorrect and incomplete financial data and reach faulty

conclusions concerning a sale of certain assets.

12.      Finally, some of the defendants received preferential payments and fraudulent

conveyances, and this action seeks to recover those transfers.

## Jurisdiction And Venue

13.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and

1334.

14.      Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

## Parties

15.      Plaintiff Chad J. Shandler is the duly appointed Creditor Trustee herein.

16.      Defendant DLJMB is a Delaware corporation with its principal place of business

at c/o Credit Suisse First Boston (USA), Inc., 11 Madison Ave., New York, New York 10010.

17.      Defendant DLJMB, L.P., is a Delaware limited partnership with its principal

place of business at c/o Credit Suisse First Boston (USA), Inc., 11 Madison Ave., New York,

New York 10010.

18.      Defendant DLJ Securities is a Delaware corporation with its principal place of

business at c/o Credit Suisse First Boston (USA), Inc., 11 Madison Ave., New York, New York

10011.

19.      Defendant Donaldson, Lufkin & Jenrette, Inc., is a Delaware corporation with its

principal place of business at 11 Madison Ave., New York, NY 10010.

20.     Defendant DLJ Capital is a Delaware corporation with its principal place of business at c/o Credit Suisse First Boston (USA), Inc., 11 Madison Ave., New York, New York 10011.

21.     Defendant MBP II is a Delaware limited partnership and a private equity fund associated with DLJ, with its principal place of business located at 11 Madison Ave., New York, New York 10011.

22.     Defendant DLJ Offshore is a Netherlands Antilles limited partnership and affiliated with DLJ Merchant Banking Partners II, with its principal place of business at 11 Madison Ave., New York, New York 10011.

23.     Defendant DLJ Millennium Partners-A is a Delaware limited partnership and a private equity fund associated with DLJ, with its principal place of business at 11 Madison Ave., New York, New York 10011.

24.     Defendant DLJ Millennium Partners is a Delaware limited partnership and a private equity fund associated with DLJ, with its principal place of business at 11 Madison Ave., New York, New York 10011.

25.     Defendant DLJ ESC is a Delaware limited partnership and a private equity fund associated with DLJ, with its principal place of business at 11 Madison Ave., New York, New York 10011.

26.     Defendant DLJ EAB is a Delaware limited partnership and a private equity fund associated with DLJ, with its principal place of business at 11 Madison Ave., New York, New York 10011.

27.      Defendant DLJMB II-A is a Delaware limited partnership and a private equity fund associated with DLJ, with its principal place of business at 11 Madison Ave., New York, New York 10011.

28.      Defendant DLJMB II is a Delaware limited partnership and a private equity fund associated with DLJ, with its principal place of business at 11 Madison Ave., New York, New York 10011.

29.      Defendant DLJ Diversified Partners is a Delaware limited partnership and a private equity fund associated with DLJ, with its principal place of business at 11 Madison Ave., New York, New York 10011.

30.      Defendant DLJ Diversified Partners-A is a Delaware limited partnership and a private equity fund associated with DLJ, with its principal place of business at 11 Madison Ave., New York, New York 10011.

31.      Defendant William F. Dawson, Jr. was, at all times relevant herein, a Director of Insilco and a resident of Lever House, 390 Park Ave., New York, New York 10022.

32.      Defendant Thompson Dean was, at all times relevant herein, a Director of Insilco and a resident of 2361 Rosecrans Ave., Ste. 180, El Segundo, California 90245.

33.      Defendant John F. Fort, III was, at times relevant herein, a Director of Insilco and a resident of 2160 Satellite Blvd., Ste. 200, Duluth, Georgia 30097.

34.      Defendant George A. Peinado was, at times relevant herein, a Director of Insilco and a resident of and a resident of Three First National Plaza, Suite 3800, Chicago, Illinois 60602.

35.      Defendant Keith Palumbo was, at times relevant herein, a Director of Insilco and a resident of 101 Huntington Ave., Boston, Massachusetts 02199.

36.     Defendant Randall Curran was, at times relevant herein, a Director of Insilco and a resident of Belleview Tower, 7887 East Belleview Ave., Suite 650, Englewood, Colorado 80111.

37.     Defendant David Howe was, at all times relevant herein, a Director of Insilco and a resident of 51 West 52nd St., 23rd Floor, New York, New York 10019.

38.     Defendant James Ashton was, at times relevant herein, a Director of Insilco and a resident of 333 Sandy Springs Circle, Suite 106, Atlanta, Georgia 30328.

39.     Defendant McDonald Investments, Inc., is an Ohio corporation with its principal place of business at 800 Superior Ave., Cleveland, Ohio 44114.

**Background**

40.     On December 16, 2002 (the "Petition Date"), Insilco filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.  Insilco continued in the management and operation of its businesses and properties as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

41.     On February 13, 2004, the Debtors filed the Amended Joint Liquidating Plan Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan").

42.     On June 10, 2004, this Court entered the Findings of Fact, Conclusions of Law and Order Under Section 1129 of the Bankruptcy Code and Rule 3020 of the Bankruptcy Rules Confirming the Amended Joint Liquidating Plan (the "Confirmation Order").  The Plan became effective on October 6, 2004 (the "Effective Date").

43.     Pursuant to the Plan, a Creditor Trust was created.  The duties of the Trustee of the Creditor Trust are governed by the Insilco Liquidating Trust Agreement (the "Trust Agreement") entered into between the Debtors and Chad J. Shandler of Traxi, LLC.

44.     Pursuant to sections 7.2 and 7.3 of the Plan, the Trustee is responsible for , *inter alia*, filing and prosecuting all actions, causes of actions, or claims of the Debtors or their states arising under Chapter 5 of the Bankruptcy Code..

**DLJ Takes Control Of Insilco**

45.     In late 1997 or early 1998, DLJMB identified Insilco as an attractive equity investment.  In 1998, DLJMB and its affiliates acquired control of Insilco through a merger transaction that closed in August 1998.  At all relevant times, DLJ operated through a plethora of corporate forms to exert its control and domination over Insilco's affairs and engage in self-dealing at the expense of Insilco and Insilco's creditors.

46.     From 1998 through the petition date, DLJMB exercised control and domination over Insilco's affairs in order to advance DLJ's own portfolio strategy for its own benefit.  These actions, permitted and authorized by Insilco's DLJ-dominated Board of Directors, were at the expense of Insilco and its unsecured creditors and included:

(a)     requiring and causing Insilco to pay for the service of DLJ entities and DLJ-selected advisors who rendered services to, and for the benefit of, DLJ rather than Insilco;

(b)     wrongfully inducing Insilco to spin off a substantial and profitable portion of its business to a DLJ portfolio company as part of a strategy to benefit the DLJ portfolio;

(c)     fraudulently masking the true nature of the spin-off transaction by causing the appointment of a DLJ insider as a purportedly disinterested director and sole member of the special committee tasked with negotiating and approving the transaction; and

(d)     delaying improperly the filing of insolvency petitions, deepening Insilco's insolvency and compounding the losses sustained by Insilco and the unsecured creditors.

47.     At the time that DLJMB acquired control, Insilco had three primary operating

divisions, which were operated independently:

(a)     the Automotive Businesses, which manufactured specialized automotive

components;

(b)     the Publishing Business, which was engaged primarily in the contract

design and printing of student yearbooks; and

(c)     the Technologies Segments, which consisted of four sub-units that

manufactured telecommunications and electrical component products for computer networking,

telephone digital switching, premises wiring, mainframe computer, automotive and medical

equipment markets.

48.     Soon after DLJ acquired control, DLJMB caused Insilco to pursue an aggressive

acquisition and divestiture strategy with the goal of preparing Insilco for a successful public

offering.  As part of this strategy, DLJMB caused Insilco to sell off the Publishing Business,

known as Taylor Publishing, and to pursue strategies to increase Insilco's technology segments

and automotive segments by acquiring their market competitors.

49.     From 1998 through and including March 2002, DLJMB and the DLJ affiliates

monitored, were involved in, and exerted control over many of the day-to-day management

decisions of Insilco.  During this time period, DLJMB's William Dawson, Keith Palumbo and,

toward the end of the timeframe, George Peinado were in daily or near-daily contact with

Insilco's management team.  As discussed in detail below, these same individuals served on

Insilco's Board of Directors.

50.     Insilco's management team changed during the relevant time period.  When DLJ

acquired control, the management team, headed by Robert Smialek as Chief Executive Officer

("CEO") and Chairman of the Board of Directors, continued in their management roles.  In or around June 2000, however, DLJMB forced Mr. Smialek to step down and elevated Insilco's then-Chief Financial Officer ("CFO"), David Kauer, to the positions of CEO and Board Chairman.  Kauer continued to serve in those capacities through and including the Petition Date.

**DLJMB Installed Insiders On Insilco's Board**

51.      Since its acquisition in 1998, DLJMB has controlled and dominated Insilco's ownership and management in part by installing its designees as a majority of the Insilco Board of Directors.  By 1999, DLJMB installed DLJ insiders as four of the seven Insilco Directors (the DLJ insiders were William F. Dawson, Jr., Thompson Dean, John F. Fort, III, and Keith Palumbo).

52.      The proxy admitted that Mr. Dawson, Mr. Dean and Mr. Palumbo were DLJ insiders but failed to disclose that Mr. Fort, a member of a DLJ Merchant Banking Advisory Board, was also an insider and affiliate of DLJ.

53.      The remaining directors in 1999 were Randall E. Curran (Chairman of the Board of Thermadyne Holdings, one of Insilco's Automotive Business), David Y. Howe (a vice president of Insilco's minority shareholder, a Citibank affiliate), and Insilco's CEO Robert Smialek.  In mid-1999, upon Mr. Smialek's resignation, David Kauer (Mr. Smialek's replacement as Insilco CEO) was appointed to the Board.

54.      By mid-2000, the number of DLJ designees on the Board had increased to five of seven.  On July 5, 2000, the DLJ-dominated Board appointed James Ashton to the Board by unanimous written consent.  Although, at the time of his appointment, the Board identified Mr. Ashton as "completely disinterested," Mr. Ashton subsequently self-identified himself to the Board as "associated with DLJ Merchant Banking Partners II."

55.     Also in or around mid-2000, Curran resigned from the Insilco Board and was replaced by another DLJ insider, George A. Peinado.

**DLJMB Improperly Transfers Fees To Insilco**

56.     From 1998 through 2002, DLJMB engaged in a pattern and practice of transferring to Insilco the costs of services provided to, and intended to benefit, DLJ as equity holder.

57.     Throughout its relationship with Insilco, DLJMB exercised its control to require and cause Insilco to employ DLJ as Insilco's financial advisor on multiple transactions and proposed transactions.  DLJMB required Insilco to buy or sell eight (8) different businesses and amend its credit agreements three times since August 1998, generating substantial fees for DLJ attendant to each transaction.  In all, Insilco paid DLJ at least $15 million in fees between 1998 and 2002.

58.     In 1999, DLJMB required and caused Insilco to retain DLJ Securities, which acted at the behest of and in concert with DLJMB, to act as the company's financial advisor with respect to the proposed sales of the publishing and steel parts divisions.  Insilco paid DLJ substantial sums in advisory fees for these advisory services that were rendered to, and for the benefit of, DLJ as equity holder, rather than Insilco.

59.     In 2000, DLJ Capital, which acted at the behest of and in concert with DLJMB, received $5.3 million in fees for its efforts as Lead Arranger and Syndication Agent in connection with Insilco's Credit Agreement.  Insilco paid an additional $1.4 million to DLJ in fees for its retainer and advisory functions in 2000, raising DLJ's total fees income for 2000 to at least $6.7 million, all or part of which is attributable to services rendered to, or to advance the interests of, DLJ as equity holder, rather than Insilco.

60.     In January of 2002, DLJMB (now known as Credit Suisse First Boston ("CSFB")) submitted two invoices to Insilco.  The first, dated January 29, 2002, sought $265,200 for professional fees and expenses related to services provided by financial advisor Bain & Company during May and June 2001.  The second invoice, dated January 31, 2002, sought (1) $212,500 as an annual retainer for services purportedly rendered by DLJMB between January 1, 2001 and December 31, 2001; and (2) $150,000 as a retainer fee for services to be provided between January 1, 2002 and June 30, 2002.

61.     The Bain & Company advisory services referenced in the January 29, 2002 invoice were not services provided to Insilco.  Instead, in or around May and June of 2001, Bain & Company was retained by DLJMB to conduct a review of Insilco's business for DLJMB. Insilco was not involved in the decision to retain Bain & Company.  Moreover, at the time the services were provided, Insilco's management team understood that the services were being provided to, and for the benefit of, DLJ.  Bain & Company also considered DLJ, not Insilco, to be its client.

62.     On March 5, 2002, at the next Board meeting following Insilco's receipt of the CSFB invoices, the Insilco Board discussed the circumstances surrounding these invoices.  Then, at the behest and insistence of Thompson Dean, a DLJ insider and Board designate, the Board adopted a resolution authorizing Insilco to pay two CSFB invoices for "work performed or payments made by CSFB on behalf of [Insilco]" totaling $575,000 as "valid operating expenses" of Insilco.  None of the DLJ directors abstained from the vote.

63.     Neither the Bain & Company fees nor the DLJ advisory fees paid by Insilco in 2002 were for work performed or payments made by CSFB on behalf of Insilco.  Instead, these

fees were for services provided to, and for the benefit of, DLJ as equity holder, rather than Insilco.

**DLJMB Induces Insilco To Sell Valuable Automotive Business Asset To DLJ**

64.     On or around January 26, 2000, DLJ insider and Insilco Board Member William Dawson proposed to Insilco CEO David Kauer that Insilco consider a sale of Insilco's Automotive Business.

65.     Between January 26, 2000 and the April 26, 2000 Board meetings, Mr. Dawson's proposal evolved into a so-called "value creation strategy" pursuant to which Insilco's automotive assets would be sold to DLJ in a straight cash sale, accompanied by another restructuring of Insilco's debt.

66.     The Insilco Board purported to recognize a serious conflict of interest with respect to the proposed sale of Insilco's Automotive Business to DLJ.  The Insilco Board purported to address the conflict by (1) authorizing CEO Kauer to engage an investing banking company to render an opinion as to the fairness of the transaction and to provide advice in connection with the transaction negotiations; (2) authorizing CEO Kauer to engage independent legal counsel to represent Insilco in connection with the proposed transaction; and (3) resolving to appoint an independent Board member who would be charged with negotiating and approving the transaction.

67.     Pursuant to the Board's direction, CEO Kauer retained McDonald, a subsidiary of Key Corp. (with whom DLJ had an underwriting relationship), to provide a fairness opinion.

68.     Also, pursuant to the Board's direction, CEO Kauer retained the law firm of Baker Botts to represent Insilco in connection with the proposed transaction.

69.     Further, as discussed previously, on July 5, 2000, the Board adopted a resolution (1) appointing James Ashton to the Board; (2) creating a special committee to review, evaluate,

and negotiate the terms of the proposed sale to DLJ; and (3) appointing Mr. Ashton as the sole member of the special committee.

70.     In a self-serving resolution, the Insilco Board represented that Mr. Ashton was "completely disinterested in the Proposed Transactions and [had] no financial interest in common with the proponents of the Proposed Transactions."

71.     On or about July 10, 2000, the newly established special committee held an organizational meeting in which Mr. Ashton, for the first time, learned the details of the proposed transaction.  At the same time, Mr. Ashton – acting as the special committee – ratified all prior actions of the Board related to the proposed transaction – including the retention of McDonald and Baker Botts.

72.     Just four days later, on or about July 14, 2000, Mr. Ashton, as the sole "independent" special committee member, approved the terms of Insilco's agreement to sell the Automotive Business to the DLJ venture ThermaSys at a sale price of $147 million.  Insilco's Board then ratified Mr. Ashton's decision and authorized the sale.

73.     The purportedly "independent" Mr. Ashton was soon installed as the chairman of the ThermaSys board of directors and later CEO of ThermaSys.

**McDonald Fairness Opinion**

74.     On or about July 14, 2000, McDonald made a presentation to the special committee in which it conveyed its opinion that DLJMB's $147 million offer was fair to Insilco. McDonald's conclusion relied on a financial analysis that assessed the Automotive Business' adjusted Last Twelve Month EBITDA ("LTM EBITDA") at $32.4 million.  This assessment was incomplete, however, in that it failed to account for necessary adjustments to LTM EBITDA that, when properly considered, materially impact the valuation of Insilco's Automotive

Business.  Specifically, although aware of the productivity improvements and reduced costs,

McDonald ignored this information and failed to adjust the LTM EBITDA to account for them.

75.    At around the same time, DLJMB made representations to lenders that directly

contradicted McDonald's assessment of the Automotive Business' adjusted LTM EBITDA.  In a

July 2000 presentation to lenders, DLJMB presented a valuation based on an adjusted LTM

EBITDA of $35.7 million.  DLJMB's assessment of the adjusted LTM.EBITDA accounted for

adjustments related to productivity improvements, facility closures and other cost reductions.

76.    On or about July 20, 2000, McDonald provided the special committee with a

written opinion stating that the transaction – already approved by the special committee and

ratified by the Board – was "fair, from a financial point of view" to Insilco.  This written fairness

opinion suffered from the same flaws as the July 14, 2000 opinion.

**DLJMB Requires And Causes Insilco To Violate Its Credit Agreement**

77.    DLJMB used its insider and control status to generate additional fees for DLJ and

expose Insilco to three major transactions, all scheduled to close on August 25, 2000:  (a) the

sale of the Automotive Business to ThermaSys, (b) Insilco's purchase of PCM, and (c) a major

refinancing of Insilco's credit facility.

78.    Insilco completed its transactions on August 25, 2000 when it executed the

Second Amended and Restated Credit Agreement dated as of August 25, 2000, as thereafter

amended from time to time, among Insilco Technologies and TAT Technologies Inc., as

Borrowers, U.S. Bank, N.A., as Administrative Agent, DLJ Capital as Lead Arranger and

Syndication Agent, TransAmerica Business Credit Corporation and LaSalle National Bank, as

co-Documentation Agents, and the various financial institutions party thereto (the "Credit

Agreement").  Significantly, DLJMB installed an affiliate, DLJ Capital, as Lead Arranger and Syndication Agent under the Credit Agreement.

79.    The Credit Agreement provided for three credit facilities:  (a) a $50 million, 6-year senior secured revolving loan (the "Revolver"), (b) a $35 million, 6-year senior secured amortizing term-A loan (the "Term-A Facility"), and (c) a $125 million, 7-year senior secured amortizing term-B loan (the "Term-B Facility").  The Revolver matured on the sixth anniversary of the Credit Agreement.  But there were no mandatory prepayments.  However, the term loan facilities did have mandatory quarterly prepayments.  The Term-A Facility required quarterly prepayments in each of its six years, beginning with December 2000, as follows:  $875,000 for the first two years, $1,312,500 for the third year, $1,750,000 for the fourth and fifth years and $2,187,500 for the final year.  The Term-B Facility required quarterly prepayments of $312,500 for the first six years and quarterly prepayments of $29.4 million in the seventh year.

**Insilco Defaulted On The Credit Agreement In 2001**

80.    As 2000 drew to a close, Insilco's Board recognized that Insilco was in dire financial straits.  As of December 31, 2000, Insilco's working capital was half of its level from the previous year (from approximately $150 million to approximately $75 million), while its long-term debt remained a staggering $380,160,000 against $356,888,000 in total assets.

81.    At a February 2001 Board meeting held in DLJ's offices, David Kauer, Insilco's CEO, reported that Insilco was feeling the effects of a general downturn in the economy and most sharply in the telecommunication industry.  Insilco's largest customers were experiencing their own slow downs and it was reflected in quickly diminishing orders.

82.    Insilco came closer to financial collapse in the second quarter 2001, when Insilco's major customers further reduced their order forecasts and canceled previously placed orders.

83.    Insilco was forced to reevaluate the value of its goodwill assets.  On June 30, 2001, Insilco wrote down more than $97 million in goodwill.  Six months later it would write down an additional $50 million.

84.    Insilco was able to avoid defaulting on its loan covenants in the first quarter of 2001; it violated its loan covenants in the second quarter of 2001.  As of June 30, 2001, Insilco was in violation of the loan covenants under the Credit Agreement, at least as early as June 30, 2001, Insilco was insolvent.

**DLJMB Delayed The Filing Of Insolvency Petitions**

85.    Upon information and belief, beginning on or before June 2001, DLJMB knew that Insilco could not survive in its current form.  At that point, CEO Kauer knew that Insilco could not be maintained as a "going concern" as constituted and that the company was in serious financial distress.  Bankruptcy was a foregone conclusion.

86.    Despite this recognition, DLJMB did not permit Insilco to file a petition for bankruptcy.  In addition, DLJMB did not permit Insilco to explore or consider strategic alternatives.  Instead, DLJMB delayed the filing by (1) retaining Bain & Company to review Insilco's business; (2) causing Insilco to consult with a DLJ workout and restructuring specialist; (3) causing Insilco to receive a Term-C Loan in direct violation of the terms of the 12% Note Indenture; and (4) abandoning Insilco in or around the first calendar quarter of 2002.

87.    As noted above, the Credit Agreement originally provided for a Term-A Facility and a Term-B Facility.  As also noted above, Insilco was in violation of the Credit Agreement as of June 30, 2001.

88.    By August 6, 2001, when Insilco held a Board meeting, the Lenders requested that Insilco produce additional cash to postpone enforcement of the Credit Agreement.  During the initial negotiations, upon information and belief, the Lenders requested that DLJMB

contribute additional equity capital.  Initially, DLJMB was going to contribute such funds as equity capital.  Thereafter, after internal discussions at DLJMB, DLJMB determined to attempt to advance the funds so that the funds may be characterized as debt rather than equity.

89.    Eventually, the Lenders agreed to waive Insilco's defaults provided that Insilco's majority equity holders, DLJMB (and CVC), make a "cash infusion" of $15 million, junior and subordinate to the claims of the Lenders.

90.    The $15 million cash infusion by DLJMB was risk capital and an "investment." Insilco also agreed to amend certain negative covenants in the Credit Agreement.

91.    On August 15, 2001, Insilco and DLJMB agreed to the terms of the Credit Agreement as amended and restated effective June 30, 2001.

92.    Under the Credit Agreement as amended, DLJMB agreed to make an equity investment, under the guise of a "loan" pursuant to section 2.1.6 of the Credit Agreement (the "Term-C Loan"), to be made by the following DLJ affiliates acting in concert with DLJMB: DLJMB II, DLJ Offshore, DLJ Diversified Partners, DLJ Diversified Partners-A, DLJ EAB, DLJ Millennium Partners, DLJ ESC, DLJ Millennium Partners-A, DLJMB II-A, and MBP, and their respective successors and assigns (collectively, the "Term-C Lenders").  Pursuant to this "investment," DLJ received warrants to purchase approximately 60,000 shares of Insilco's common stock at $0.01 per share, which would, upon exercise, constitute approximately 38% of Insilco's then-outstanding common stock.  Insilco used the $15 million cash infusion to shore up Insilco's cash balances and meet its other loan covenants under the Credit Agreement.

93.    The Term-C Loan was part of the Pre-Petition Facility but was, by its terms, an unsecured obligation not entitled to the benefit of the liens granted to the Lenders.

94.     DLJMB attempted to camouflage its risk investments in Insilco by acting through DLJ affiliates (the Term-C Lenders) and disguising the investment as a loan to avoid the fate of equity holders in bankruptcy.

95.     Insilco's Board reported in the minutes of its August 14, 2001 meeting that it obtained a fairness opinion from the firm Houlihan Lokey Howard & Zukem Financial Advisors, Inc., which provided that (a) transaction was "fair" to Insilco's outstanding 14% Senior Discount Noteholders, (b) the dilution that Insilco could suffer as a result of the transactions was "fair" to Insilco, and (c) the terms which Insilco received in this transaction were no less favorable than what Insilco could have "obtained in a comparable arm's length transaction with an unaffiliated entity."

96.     The Lenders received an agreement from Insilco to reduce the required commitment for the Revolver from $50 million to $44 million.  Insilco also agreed to add unencumbered real property with a value in excess of $2 million as collateral.

97.     Upon information and belief, DLJMB knew, or should have known, that the $15 million cash infusion was ineffective to rescue Insilco from its insolvency.  The purpose and effect of the $15 million "investment" was merely to prolong and deepen the period of insolvency prior to the filing of insolvency petitions to permit DLJMB to attempt to improperly elevate DLJ's interests above Insilco's unsecured creditors.

98.     The Term-C Loan violated the 12% Note Indenture.  The anti-layering provision of the 12% Note Indenture (Section 10.10, "Limitation on Layered Debt") prohibited the issuance of debt that was subordinate to Senior Debt (under the Credit Agreement) but was senior in right of payment to the 12% Senior Notes.  Yet this is precisely what Insilco and DLJMB attempted to accomplish under the Term-C Loan.

99.     Upon information and belief, DLJMB subsequently syndicated and/or assigned its interest in the revolving facility and Term-A and Term-B Facilities to various lenders.  DLJMB continued to solicit potential lenders to invest in Insilco high-yield secured credit facilities.  DLJMB (now known as Credit Suisse First Boston) held a "high-yield conference" in January 2001 to sell the financing.  DLJMB tried to present Insilco's financials in the best possible light despite the fact that the market was already turning against Insilco.

100.     On November 7, 2001 Insilco agreed to provide the Lenders additional collateral in the form of an interest in the "Star Services" litigation.  On November 13, 2001 Insilco reported that its insolvency worsened, as third quarter sales totaled $56.5 million compared with $114.2 million in 2000.

101.     Despite the serve liquidity crisis and the company's doubtful ability to continue as a going concern as constituted, the Insilco Directors failed to take prudent and reasonable action and, instead, followed the directives of DLJ.

**DLJMB Further Delays The Necessary Filing Of Petition**

102.     Despite serious questions about Insilco's financial condition dating back to at least June 2001, DLJMB failed to allow the Board to consider strategic alternatives and the Insilco Directors' acquiesced and failed to take necessary actions.  These actions and inactions resulted in the deterioration of the company.

103.     By January 2002, Insilco's Board already had determined that the combination of the declining economy and Insilco's highly leveraged position seriously threatened Insilco's ability to continue as a going concern.  Only then did DLJMB finally decide to force the sale of Insilco's remaining assets.  But DLJMB was fearful that its status as an insider and affiliate of Insilco would result in the avoidance of the liens and claims of DLJ.

104.     DLJMB exercised its dominance over Insilco, refusing to allow the Board to take reasonably prudent actions and manipulating Insilco's assets sale process and the timing of Insilco's insolvency petitions to ensure that DLJ, alone among all of Insilco's creditors, would benefit from the remaining assets of Insilco.

105.     At that time, Insilco was in default pursuant to the 12% Notes and, because of cross-default covenants, Insilco was also in default of the Credit Agreement.

106.     In addition, on March 31, 2002, Insilco failed to meet the EBITDA covenant under the Credit Agreement and was "operating in default" on its Credit Agreement and its 12% Notes.  Insilco reported in its public filing that as a result of these defaults, the debt under the Credit Agreement, 12% Notes and 14% Senior Discount Notes was classified as "current."

107.     Despite the fact that Insilco was clearly insolvent and that its Board clearly owed fiduciary duties to all of its creditors, DLJMB exercised dominion and control over Insilco in order to enhance DLJ's position to the detriment of unsecured creditors.  DLJMB was exposed to potentially significant liability to the Lenders arising from DLJ's conflicted positions as majority equity holder, financial advisor, lender, syndication agent and lead arranger for Insilco.  Upon information and belief, despite the fiduciary duties owed by Insilco's Directors to all of Insilco's unsecured creditors, DLJMB required its appointees (who controlled the Board) to maximize the recovery of DLJMB and the Lenders at the expense of Insilco's other creditors.

108.     At the April 24, 2002 teleconference meeting of Insilco's Board, David Kauer, Insilco's CEO, placed "highest priority on a quick sale of the Company, as a whole or in separate transactions."  DLJMB sought to arrange for the sale of the Company to take place within a Chapter 11 bankruptcy proceeding, which it wanted filed after receipt of letters of intent from

proposed buyers but prior to the time that the transactions were consummated.  DLJMB directed

that Insilco obtain the letters of intent by June 2002.

109.    DLJMB further exercised dominion and control over Insilco by demanding that

Insilco continue to delay the filing of insolvency petitions as directed by DLJMB.  Insilco also

negotiated a "Forbearance Agreement" with the Lenders.  The Lenders agreed not to accelerate

their loans or take enforcement actions on their liens during the term of the forbearance.  DLJMB

premised the transactions on the basis that Insilco would refrain from initiating insolvency

proceedings.  The April 24, 2002 Board minutes indicate that Insilco's Board gave little or no

consideration to strategic alternatives and simply agreed to the Forbearance Agreement with the

Lenders at the direction of DLJMB and the DLJ-controlled Directors.

110.    The interests of unsecured creditors were sacrificed in connection with the

Forbearance Agreement, as DLJMB improperly delayed the filing of insolvency petitions.  The

Lenders also obtained a pledge of the remaining 35% of Insilco's foreign subsidiaries.  This

pledge caused Insilco to incur an approximately $8 million tax liability.  Insilco continued to

default on its Credit Agreement, failing to make its $7.2 million payment as required on

August 15, 2002 on the 12% Note and failing to meet other covenants under the Credit

Agreement for June 30, 2002 and September 30, 2002.  As noted above, Insilco filed the

insolvency petitions on December 16, 2002.

111.    Insilco, the estates and the unsecured creditors have been harmed as a direct result

of the inequitable and improper conduct of DLJ.

**Insilco Directors**

112.    By approving actions and strategies designed to advance DLJ's interests while

compromising Insilco's interests, managing the company in an unfair, unjust and inequitable

manner not designed to benefit the company, and failing to avoid and prevent corporate waste

and unnecessary expense, the Insilco Directors breached their duties of care, loyalty, honesty and good faith.

113.    The Insilco Directors repeatedly approved payment of fees for services that were provided to, and for the benefit of, DLJ as equity holder rather than Insilco.  The Board approved the transfer to DLJ of Insilco's profitable Automotive Business.  In so doing, the Insilco Directors relied on the judgment of an interested director and failed to recognize serious flaws in the McDonald Fairness Opinion.  In spite of Insilco's insolvency, the Insilco Directors failed to challenge DLJMB's blatant efforts to delay the filing of the petition.  Through these actions – and inactions – the Insilco Directors breached their fiduciary duties.

114.    Throughout this period, the Insilco Directors' misfeasance, negligence, acquiescence and indifference toward Insilco and its creditors caused serious harm to Insilco and its creditors and breached their fiduciary duties.

115.    Moreover, by its actions specified above, DLJMB aided and abetted the Insilco Directors' breaches of fiduciary duties.

**FIRST CLAIM FOR RELIEF**
(Transfers Pursuant to 11 U.S.C. § 547(b))
(Against DLJMB)

116.    Plaintiff restates the allegations contained in paragraphs 1 through 115 as though fully set forth herein.

117.    Sections 547(b) and 550(a) of the Bankruptcy Code provide for the avoidance and recovery of a transfer to a creditor of an interest of a debtor in property if the transfer is shown to have constituted a "preference" as defined in the statute.

118.    Pursuant to section 547(b) of the Bankruptcy Code and sections 7.2 and 7.3 of the Plan, the Trustee may avoid any transfer of an interest of Insilco in property (a) to or for the

benefit of a creditor, (b) for or on account of an antecedent debt owed by Insilco before such transfer was made, (c) made while Insilco was insolvent, (d) made on or within 90 days before the filing of the petition, or between 90 days and one year before the filing of the petition, if such creditor at the time of such transfer was an insider, (e) that enables such creditor to receive more in satisfaction of its claims than it would receive in a case under chapter 7 of the Bankruptcy Code if the transfer had not been made.

119.     Defendant DLJMB is an insider of Insilco as that term is defined in section 101(31) of the Bankruptcy Code.

120.     During the one year period preceding the Petition Date, Insilco made certain transfers of its property (the "Transfers") totaling not less than $477,700 to or for the benefit of DLJMB.

121.     DLJMB was a creditor of Insilco at the time of each of the Transfers.

122.     Each of the Transfers was made on account of an antecedent debt or debts owed by Insilco to or for the benefit of DLJMB before each Transfer was made.

123.     Insilco was insolvent at the time of each of the Transfers.

124.     The Transfers enabled DLJMB to receive more than it would have received if (a) Insilco's cases were cases under chapter 7 of the Bankruptcy Code, (b) the Transfers had not been made, and (c) DLJMB had received payment of such debt or debts to the extent provided by the provisions of the Bankruptcy Code.

125.     By reason of the foregoing, the Transfers should be avoided and set aside as preferential.

SECOND CLAIM FOR RELIEF
(Avoidance of Fraudulent Transfers Pursuant to 11 U.S.C. 548(a)(1)(B))
(Against DLJ)

126.    Plaintiff restates the allegations contained in paragraphs 1 through 125 as though fully set forth herein.

127.    Under § 548(a)(1)(B) of the Bankruptcy Code, a transfer is avoidable if (i) such transfer was made or incurred on or within one year before the date of the filing of the petition, (ii) the debtor did not receive reasonably equivalent value for the property transferred, and (iii) one of the following three tests is satisfied:

(a)    the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(b)    the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(c)    the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.  11 U.S.C. § 548.

128.    Insilco made paid certain advisory fees (the "Advisory Fee Transfers") totaling not less than $447,700 to or for the benefit of DLJ and DLJ affiliates; and (i) such transfers were made within one year of the Insilco bankruptcy filing; (ii) the transferors received less than equivalent value in exchange for the fees paid; and (iii) the transferors were either insolvent at the time of the transfer, or, at the very least, were rendered insolvent as a result.

129.    Specifically, Insilco's receipt of services intended to benefit DLJ as equity holder rather than Insilco was not reasonably equivalent value or fair consideration in exchange for the fees paid.

130.     Accordingly, the Advisory Fee Transfers made by Insilco to DLJ and DLJ affiliates should be avoided as fraudulent transfers, and the value of such transfers should be recovered and preserved for the benefit of Insilco's estates and unsecured creditors.

THIRD CLAIM FOR RELIEF
(Fraud)
(Against DLJ)

131.     Plaintiff restates the allegations contained in paragraphs 1 through 130 as though fully set forth herein.

132.     In an effort to mask the true nature of the ThermaSys transaction, DLJ, through its agents William Dawson and Keith Palumbo, falsely represented to Insilco's managers and officers that James Ashton was a disinterested party who could adequately protect Insilco's interests with respect to negotiation and approval of the transaction.

133.     Mr. Dawson and Mr. Palumbo were authorized to act and speak on DLJ's behalf with respect to Insilco.

134.     Mr. Ashton was not a disinterested party.

135.     DLJ, Mr. Dawson and Mr. Palumbo knew that Mr. Ashton was not a disinterested party.

136.     DLJ, through its agents Mr. Dawson and Mr. Palumbo, made numerous other representations and undertook actions designed to obscure the ThermaSys transaction's substantial benefits to DLJ and harm to Insilco.

137.     In adopting the resolution appointing Mr. Ashton to the Insilco Board and creating a special committee tasked with negotiating and assessing the fairness of the ThermaSys Transaction and in approving the transaction based on the special committee's recommendation, the Insilco Directors relied on DLJ's misrepresentations.

138.    Insilco suffered damage as a result of its reliance on DLJ's efforts to mask the ThermaSys Transaction's benefits to DLJ and harm to Insilco.

139.    Based on the foregoing, DLJ is liable in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
(Professional Malpractice)
(Against DLJ)

140.    Plaintiff restates the allegations contained in paragraphs 1 through 139 as though fully set forth herein.

141.    DLJ was retained by Insilco to provide professional financial advisory services and had a duty to perform those services in a competent manner consistent with industry standards.

142.    DLJ breached this duty by failing to properly perform its services and failing to render objective advice to Insilco.

143.    Insilco was damaged by DLJ's failure to meet the industry standards applicable to financial advisory service providers.

144.    Based on the foregoing, the Trustee is entitled to recover such money damages as were caused by DLJ's breach.

### FIFTH CLAIM FOR RELIEF
(Unjust Enrichment)
(Against DLJ)

145.    Plaintiff restates the allegations contained in paragraphs 1 through 144 as though fully set forth herein.

146.    DLJ has been unjustly enriched by the receipt of Insilco assets, funds and other property.

147.    In equity and good conscience, the Defendants should not be allowed to retain these assets, funds and other property.

148.     Based on the foregoing, the Trustee is entitled to an order directing the

Defendants to disgorge all of the Insilco assets, funds and other property they received, and

awarding that amount, to be determined at trial, to the Trustee.

SIXTH CLAIM FOR RELIEF
(Deepening Insolvency)
(Against DLJ)

149.     Plaintiff restates the allegations contained in paragraphs 1 through 148 as though

fully set forth herein.

150.     DLJ induced the Insilco Directors to proceed with the July 2001 transaction, at a

time when they knew that Insilco was insolvent.  DLJ required Insilco to delay filing petitions of

insolvency to allow time for Bain & Company to conduct a review of Insilco's operations to

permit DLJ to evaluate its equity position.  DLJ also required Insilco to delay filing petitions of

insolvency until after DLJ considered alternatives and possible asset sales.  DLJ further required

Insilco to process bogus fees for unearned services instead of proceeding to file petitions of

insolvency.

151.     Bankruptcy petitions were not filed until December 16, 2002 – only after the July

2001 transaction was completed.

152.     Starting on or before June 30, 2001 and continuing until the Petition Date, the

Defendants caused Insilco to delay filing insolvency petitions.

153.     Insilco suffered injury from fraudulently extended life, dissipation of assets and

increased insolvency.  As such, Insilco's creditors lost substantial value that would have

otherwise been available to satisfy their claims.

154.     Accordingly, DLJ violated the deepening insolvency doctrine and is liable for

damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
(Equitable Subordination — 11 U.S.C. § 510(c))
(Against DLJ)

155.    Plaintiff restates the allegations contained in paragraphs 1 through 154 as though fully set forth herein.

156.    Based upon the foregoing, DLJ engaged in inequitable, unconscionable, and unfair conduct.

157.    The inequitable, unconscionable, and unfair conduct of DLJ resulted in harm to Insilco and its creditors and/or gave DLJ an unfair advantage over Insilco's other creditors.

158.    Equitable subordination of all of the claims of DLJ would be consistent with the provisions of the Bankruptcy Code.

159.    Equitable subordination of all of the claims of DLJ is appropriate pursuant to 11 U.S.C. § 510.

160.    DLJ's liens and security interests should be avoided, annulled, recovered, and preserved for the benefit of the Insilco estates and DLJ's claims should thus be subordinated to the claims of Insilco's unsecured creditors.

## EIGHTH CLAIM FOR RELIEF
(Aiding and Abetting Breach of Fiduciary Duty)
(Against DLJ)

161.    Plaintiff restates the allegations contained in paragraphs 1 through 160 as though fully set forth herein.

162.    The Insilco Board of Directors owed fiduciary duties to act with the utmost good faith, loyalty, fair dealing, and care toward Insilco.

163.    As Insilco approached insolvency in June 2001, the Insilco Directors owed fiduciary duties to act with the utmost good faith, loyalty, fair dealing, and care toward Insilco's creditors, including the duty to safeguard Insilco's assets for the creditors' benefit.

164.     The Insilco Directors breached their fiduciary duties by continuing to operate Insilco businesses at a loss and entering in the July 2001 Amendment instead of filing for bankruptcy petitions.  If Insilco had not entered into the July 2001 Amendment, thereby granting DLJ first priority liens and security interests in all of Insilco's assets, more would have been available to pay the claims of unsecured creditors.

165.     The Insilco Directors breached their fiduciary duties to creditors by not filing bankruptcy petitions within 90 days after the July 2001 Amendment.  Well before the end of that period, it was evident that Insilco did not have sufficient working capital to maintain Insilco's business operations or resolve the liquidity crisis.

166.     The Insilco Directors breached their fiduciary duties by authorizing payment of fees for services that were provided to, and for the benefit of, DLJ as equity holder, rather than Insilco.

167.     The Insilco Directors breached their fiduciary duties by approving a transaction transferring Insilco's Automotive Business to DLJ for a price that was unfair to Insilco.

168.     DLJ aided and abetted these breaches by advancing money to Insilco, which enabled Insilco to delay the filing of bankruptcy petitions.  DLJ also aided and abetted these breaches by urging the Insilco Directors not to file bankruptcy petitions and threatening negative consequences if they did so.

169.     DLJ aided and abetted the these breaches by (1) knowingly taking actions to require and cause the Insilco Directors to pay fees for services that were provided to, and for the benefit of, DLJ as equity holder rather than Insilco; (2) knowingly taking actions that caused the Insilco Directors to approve a transaction transferring Insilco's Automotive Business to DLJ for

31

a price that was unfair to Insilco; and (3) knowingly participating in delaying the filing of the

bankruptcy petitions for the benefit of DLJ and to the detriment of creditors.

170.    Based on the foregoing, the Trustee is entitled to recover such money damages as

were caused by aiding and abetting of these breaches of fiduciary duty.

NINTH CLAIM FOR RELIEF
(Breach of Fiduciary Duty)
(Against Insilco Directors)

171.    Plaintiff restates the allegations contained in paragraphs 1 through 170 as though

fully set forth herein.

172.    At all relevant times, the Insilco Directors owed the strictest fiduciary duties to

Insilco, including duties of care, loyalty, honesty, and disclosure, and they were required to act in

Insilco's best interests, and not for the personal benefit of the Insilco Directors.

173.    By engaging in the conduct described above, including, but not limited to, the

authorization and approval of fees for services provided to, and intended to benefit DLJ rather

than Insilco; the authorization and approval of the ThermaSys transaction with DLJ, the failure

to seek alternate financing, the failure to conclude asset sales, and the failure to seek bankruptcy

protection at the appropriate time, each of the Insilco Directors deliberately and in bad faith

breached their fiduciary duties owed to Insilco.

174.    The Insilco Directors breached their duty of due care by failing to act on an

informed basis, failing to inform themselves of all material information reasonably available to

them, and in acting with a reckless indifference and deliberate disregard of the interests of Insilco

and its creditors.

175.    The Insilco Directors breached their duties of good faith and loyalty affirmatively

acting to further the interests of DLJ at the expense of Insilco and its creditors.  The Insilco

Directors acted knowingly and deliberately against the interests of Insilco and its creditors, and

32

the Insilco Directors ignored the deficiencies in the information and system of business reporting and planning at Insilco.

176.    The violations by the Insilco Directors of their fiduciary duties were willful and knowing and made in bad faith.

177.    Insilco and its creditors have been and are being further damaged by the foregoing breach of their fiduciary duties by the Insilco Directors.

178.    Because of the intentional nature of the wrongful conduct by the Insilco Directors, and the abuse of their positions of trust, the Trustee is entitled to punitive as well as compensatory damages in an amount to be proven at trial.

TENTH CLAIM FOR RELIEF
(Abuse of Control)
(Against DLJ and Insilco Directors)

179.    Plaintiff restates the allegations contained in paragraphs 1 through 178 as though fully set forth herein.

180.    DLJMB and the Insilco Directors dominated and controlled the business affairs of Insilco through DLJ's stock ownership, relations among DLJ and the Insilco Directors, and control over Insilco director positions, management positions, financial dealings, and otherwise. In engaging in the conduct described herein, the Insilco Directors acted to further their own private interests to the detriment of Insilco and in abuse of the positions of control of the Insilco Directors.

181.    The Insilco Directors breached and violated their fiduciary obligations to Insilco and its creditors, as described above.  Each of the Insilco Directors knew or should have known that the acts and omissions of the other Insilco Directors constituted a breach of fiduciary duty, corporate waste, and abuse of control.

182.     Each of the Insilco Directors knowingly gave substantial assistance to the others in engaging in such conduct.  Without such substantial assistance and encouragement, the wrongful acts could not have occurred.

183.     As a result of the wrongful conduct of the Insilco Directors, the Insilco estates and creditors have suffered and continue to suffer economic losses and non-economic losses, such as the loss of reputation and goodwill.  Insilco has also suffered other general and specific damages including, but not limited to, lost profits, lost interest, the expenses arising from investigations, and financial losses arising from corporate waste, all in an amount to be determined at trial.

ELEVENTH CLAIM FOR RELIEF
(Professional Malpractice)
(Against McDonald Investments)

184.     Plaintiff restates the allegations contained in paragraphs 1 through 183 as though fully set forth herein.

185.     McDonald was retained by Insilco to provide professional financial advisory services and had a duty to perform those services in a competent manner consistent with industry standards.

186.     McDonald breached this duty by failing to properly perform its services and failing to properly consider all relevant factors prior to issuing a fairness opinion on the ThermaSys transaction.

187.     Insilco was damaged by McDonald's failure to meet the industry standards applicable to financial advisory service providers rendering fairness opinions.

188.     Based on the foregoing, the Trustee is entitled to recover such money damages as were caused by McDonald's breach.

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

A.      On the First Claim for Relief, for a judgment (i) setting aside the Transfers pursuant to 11 U.S.C. § 547(b) and 550; and (ii) awarding Plaintiff monetary relief in an amount to be determined at trial, plus interest;

B.      On the Second Claim for Relief, for a judgment (i) setting aside the Transfers pursuant to 11 U.S.C. §548(a)(1)(B), and (ii) ordering that the value of such transfers should be recovered and preserved for the benefit of the estates and unsecured creditors, plus interest;

C.      On the Third Claim for Relief, for a judgment awarding compensatory damages in an amount to be determined at trial, plus interest;

D.      On the Fourth Claim for Relief, for a judgment awarding compensatory damages in an amount to be determined at trial, plus interest;

E.      On the Fifth Claim for Relief, for a judgment (i) ordering and directing the Defendants to disgorge all of Insilco's assets, funds, and other property they received, and (ii) awarding compensatory damages in an amount to be determined at trial, plus interest;

F.      On the Sixth Claim for Relief, for a judgment awarding damages in an amount to be determined at trial, plus interest;

G.      On the Seventh Claim for Relief, for a judgment ordering (i) that DLJ's liens and security interests should be avoided, annulled, recovered and preserved for the benefit of the estates and (ii) ordering the equitable subordination of DLJ's claims to the claims of the unsecured creditors;

H.      On the Eighth Claim for Relief, for a judgment awarding compensatory damages arising out of DLJ's breaches of its fiduciary duties to Insilco and its creditors in an amount to be determined at trial, plus interest;

I.      On the Ninth Claim for Relief, for a judgment awarding compensatory damages arising out of the Insilco Directors' breaches of their fiduciary duties to Insilco in an amount to be determined at trial, together with punitive damages, plus interest;

J.      On the Tenth Claim for Relief, for a judgment awarding compensatory damages that include, but are not limited to, damages for lost profits, lost interest, the expenses arising from investigations, and financial losses arising from corporate waste, all in an amount to be determined at trial, plus interest;

K.      On the Eleventh Claim for Relief, for a judgment awarding compensatory damages in an amount to be determined at trial, plus interest; and

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

L.      Granting pre- and post-judgment interest, attorneys' fees, costs and

disbursements, as applicable, together with such other and further relief as the Court deems just

and proper.

Dated:   Wilmington, Delaware
         December 15, 2004

               /s/ Michael R. Lastowski
Michael R. Lastowski (ID No. 3892)
Richard W. Riley (ID No. 4052)
Robert M. Hirsh
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Telephone:     (302) 657-4900
Facsimile:     (302) 657-4901
             mlastowski@duanemorris.com
             rwriley@duanemorris.com

-and-

ARENT FOX PLLC
Andrew I. Silfen
Schuyler G. Carroll
Michael S. Cryan
1675 Broadway
New York, NY  10019
Telephone:     (212) 484-3900

Counsel for Chad J. Shandler, Creditor Trustee